## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) **Criminal Action No. 07- 155-GMS** |
| | ) **Criminal Action No. 08-73-GMS** |
| AMIR HOSSEIN ARDEBILI, | ) |
| a/k/a AMIR AHKAMI, | ) |
| a/k/a ALEX DAVE | ) |

### GOVERNMENT'S SENTENCING MEMORANDUM

NOW COMES the United States of America, by and through David C. Weiss, United States Attorney for the District of Delaware, and David L. Hall, Assistant United States Attorney, in the sentencing of Defendant Amir Hossein Ardebili.

The facts set forth in this sentencing memorandum are based on the Pre-sentence Investigation Report, except as noted. As an aid to the Court, the government has attached a Factual Annex to this sentencing memorandum, which is incorporated herein. The government has filed with this sentencing memorandum a digital versatile disc ("DVD"), marked as Exhibit A, containing video and audio excerpts from undercover meetings in October 2007 between Ardebili and undercover ICE agents in a Central Asian nation.

### I. Overview

"If the United States come to war . . . the government [of Iran] could defen[d] . . . . Because they think the war is coming."

So said defendant Amir Hossein Ardebili in response to a question from an undercover agent as to why Ardebili was procuring such a wide array of military aircraft parts. "Everything but the rubber tires," said the undercover agent. And Ardebili agreed. See Exhibit A.

From his bastion inside the Islamic Republic of Iran, Ardebili operated as a procurement

agent for his sole customer: the government of the Islamic Republic of Iran. Ultimately, Ardebili left the safety of Iran to meet with undercover agents in a Central Asian nation in October 2007. During these undercover meetings, Ardebili made clear his role as an acquisitions agent exclusively for the government of Iran: "Customer is Iran . . . I don't have customer outside of Iran." See Exhibit A.

As an Iranian acquisitions agent, Ardebili acquired thousands of components for the government of Iran, valued at approximately one million dollars annually. Ardebili was involved in the acquisition of a wide range of components including military aircraft parts, Kevlar, night vision devices, and communications equipment. Most of his acquisitions involved electronics components, many of which were military components. Ardebili's modus operandi was to obtain requirements from the government of Iran, and to fill them by soliciting manufacturers and suppliers to provide him with the required components. The vast majority of his solicitations involved United States companies. During his career, he sent thousands upon thousands of solicitations to United States companies, requesting quotes on tens of thousands of components, many used in military applications.

The prosecution of Ardebili is the result of a long-term international undercover investigation by Immigration and Customs Enforcement (ICE) and Defense Criminal Investigative Service (DCIS) agents, conducted in Philadelphia, Pennsylvania; Wilmington, Delaware; Boston, Massachusetts; and multiple locations overseas. The agents employed an undercover storefront to identify and investigate illegal arms trafficking globally. In 2004, Ardebili first contacted the Philadelphia undercover storefront to purchase United States components for unlawful export to Iran. Over the next several years, Ardebili initiated repeated

2

contact with the Philadelphia storefront by sending requests for quotation on a multitude of components required by the Iranian government.

From 2005 to 2007, Ardebili negotiated the purchase and illegal export of QRS-11 Gyro Chip Sensors with undercover agents located in Boston, Massachusetts and overseas. See attached Factual Annex for additional details. The QRS-11s are solid-state gyro chips that can be used in thousands of applications to include numerous advanced aircraft, missile, space and commercial applications. The BEI GyroChip Model QRS11 Quartz Rate Sensor, Model No. QRS-11-00300-100, is listed on the United States Munitions List in Category XII(d), and therefore requires a license from the Department of State for export.

In 2006 and 2007, Ardebili negotiated the purchase and illegal export of MAPCGM0003 Phase Shifters with undercover agents located in Philadelphia, Pennsylvania and overseas. See attached Factual Annex for additional details. Phase shifters perform a key function in the active radiating elements of electronically steered antennae. They enable an antenna to point a radiated beam in specific directions. The six bit phase shifter sought by Ardebili is state of the art. Phase shifters have many applications including phased array radar, which is used in military target acquisition and missile guidance.

In 2007, Ardebili negotiated the purchase and illegal export of a Digital Air Data Computer (DADC-107) with undercover agents located overseas. See attached Factual Annex for additional details. The DADC-107 is a fully computerized Form/Fit/Function (FFF) replacement for the Central Air Data Computer installed on F-4 fighter aircraft. It calculates flight parameters including altitude, air speed, static pressure, and true angle of attack. Its high accuracy enhances weapons delivery system performance. The DADC-107 is a United States

3

Munitions List Article under category VIII(h) and therefore requires a United States State Department license for export.

All of these negotiations culminated in a face-to-face meeting between Ardebili and undercover agents in a Central Asian nation in October of 2007, after which Ardebili was arrested. Ardebili's laptop computer was seized at the time of his arrest and later searched pursuant to a United States search warrant.

Ardebili was extradited to the United States in January 2008. He entered guilty pleas on May 19, 2008.

## II. **Section 3553(a) Sentencing Factors**

In fashioning an appropriate sentence, the Court must give "rational and meaningful consideration of the statutory factors enumerated in 18 U.S.C. § 3553(a)", United States v. Grier, 475 F.3d 556, 571 (3d Cir. 2007) (en banc), and make an "individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 50 (2007). See also United States v. Tomko, 562 F.3d 558, 567 (3d Cir. 2009) (en banc).

Among the factors identified in Section 3553(a) are the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). In addition, the Court must consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). See Gall, 552 U.S. at 54 (discussing "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law"). Furthermore, the Court must consider the need for the sentence imposed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). See United States v. Goff, 501 F.3d 250, 261 (3d Cir. 2007).

4

The "nature and circumstances" of Ardebili's offenses are particularly serious because Ardebili's offense directly threatened the security of the United States. By his own admission, Ardebili was assisting Iran in preparing for war with the United States. He was a prolific acquisitions agent procuring or attempting to procure a wide range of components, including military components, for his sole customer, the government of Iran. He procured whatever the Iranian government required to maintain and upgrade its military capability. His procurement activities ranged over a wide range of military applications from military aviation to sonar to radar. Over his career, he solicited and executed millions of dollars in sales of United States components to Iran, in violation of the embargo and United States law. Ardebili's criminal activities directly and adversely affected the national security of the United States by supporting Iran's preparation for war.

If Ardebili did not know Iran's specific purpose at the moment he received a given requirement from the government of Iran, he soon learned of it by virtue of his research into the acquisition of the components. He demonstrated this during the undercover investigation. During meetings with undercover agents in October 2007, Ardebili described for undercover ICE agents the specific application of the phase shifters he was acquiring for Iran: "They [Iran] are making special radar . . . phased array radar . . . for protection, anti-missile...." See Exhibit A. Similarly, in another excerpt on Exhibit A, Ardebili demonstrates his understanding of the application of the DADC-107 computer: "I assure [you] that this is a very, very urgent inquiry because they [the Iranian government] are going to launch the F-4."

Ardebili worked to secure military components with the understanding that the Iranian government was preparing for war with the United States: "...[T]hey think the war is coming."

5

See Exhibit A.

The United States government urges the Court to give appropriate weight to the serious

nature of Ardebili's offenses in fashioning an appropriate sentence under the Sentencing

Guidelines and Title 18, United States Code, Section 3553(a). The government further requests,

pursuant to Title 18, United States Code, Section 3553(a)(2)(A)-(B), that the Court consider the

need to promote respect for the law and the need to deter similar conduct by others involved in

the illegal export of military components to Iran.

Respectfully submitted,

DAVID C. WEISS
United States Attorney

By:

David L. Hall
Assistant United States Attorney

Dated: December 1, 2009

## **FACTUAL ANNEX**

**Introduction.** Ardebili's contact with the ICE/DCIS undercover storefront in

Philadelphia began in 2004. After soliciting prices and negotiating on a large number of Iranian

government requirements, Ardebili closed three deals that resulted in criminal charges:

- From 2005 to 2007, Ardebili negotiated the purchase and illegal export of QRS-11 Gyro Chip Sensors with undercover agents located in Boston, Massachusetts and overseas.
- In 2006 and 2007, Ardebili negotiated the purchase and illegal export of MAPCGM0003 Phase Shifters with undercover agents located in Philadelphia, Pennsylvania and overseas.
- In 2007, he negotiated the purchase and illegal export of a Digital Air Data Computer (DADC-107) with undercover agents overseas.

The negotiations for these three commodities culminated in a face-to-face meeting

between Ardebili and undercover agents in a Central Asian nation in October of 2007, after

which Ardebili was arrested. Ardebili's laptop computer was seized at the time of his arrest and

later searched pursuant to a United States search warrant.

**Early Negotiations**. On May 11, 2006, an ICE undercover storefront in Europe (UCSV)

received multiple email communications from Ardebili using the name "Alex Dave". Ardebili

initially requested price quotations on aircraft parts. An ICE Special Agent (UCA#1), acting in

an undercover capacity, responded by email, utilizing an undercover persona.

On May 29, 2006, UCA#1 sent an email to Ardebili stating that the proposed exports

would require an export license under United States law and that "…if these items require export

license for you, they would also require export license for me." UCA#1 also stated that "To get

license from US, someone must provide end-use statement to US government."

On May 30, 2006, the UCSV received an email from Ardebili in which Ardebili

7

described how United States export laws could be defeated by transshipping commodities to Iran through Europe: "Working Via [your] company is very perfect way which long time we are looking for such chance. As you know there is no need for export license for [Europe] and then your [American] cousin could have new packing with new description to send our needed goods. We have do same method with companies in U.A.E., Kuwait but this Areas are restricted you know. [sic]"

On May 30, 2006, UCA#1 sent an email to Ardebili thanking him for the potential future business opportunities, and expressing a concern: "What you can say can perhaps be good business, but I stress to you what we are do is ILLEGAL in US." UCA#1 stressed the importance of discretion in their future illegal export activity: "Question: would original source of goods know they go on to Iran, or would original source be to believe all goods remain in [Europe]? With more discussion it is possible we do good business-but patience and good planning we keep us out of jail!"

On June 1, 2006, the UCSV received an email from Ardebili. Part of the text of this message read, "This is long time we are in the business and working in full security system. End user never know end user are located in Iran. You should be capable to introduce end users in [Europe] and get the parts and change description and ship it to us."

This specific deal never reached a final agreement, but the groundwork was laid for future transactions. In these communications, Ardebili not only acknowledged his understanding that exporting goods in this fashion was illegal, but also demonstrated his specific intention unlawfully to defeat United States export restrictions.

On October 9, 2006, the UCSV received a message from Ardebili asking if UCA#1 could

8

supply him with electronics. Attached to Ardebili's email was a data sheet for the BEI GyroChip QRS11. This component is a United States Munitions List item under category XII(d) and therefore requires a State Department license for export. On October 9, 2006, UCA#1 responded to Ardebili, saying that he could probably not help him with the QRS11.

From October 10, 2006, through November 8, 2006, UCA#1 and Ardebili maintained contact through email. On November 8, 2006, UCA#1 sent an email message to Ardebili asking that he provide a telephone number so that they could talk via telephone. Ardebili did so on November 9, 2006. On November 13, 2006, UCA#1 placed a consensually recorded telephone call to that telephone number and spoke with Ardebili, identifying himself as "Amir Ahkami" (an alias for Ardebili). Ardebili stated he was interested in being a representative for the UCSV in Saudi Arabia and Kuwait. Ardebili also stated that he was engaged in the business of obtaining electronics and military items for the government of Iran. Ardebili asked UCA#1 if he would be willing to assist him in obtaining such commodities from the United States for shipment to Iran, stating that his Iranian company had an office in Dubai. Ardebili acknowledged that the business was risky, as contrary to United States law. Ardebili asked UCA#1 to provide a resume printed on letterhead that Ardebili could present to various parties with whom he was doing business in the Middle East. Ardebili also stated he would like an address in Europe to which United States vendors could send licensable commodities, with the understanding that the UCSV would then forward these items on to Iran or Dubai.

On November 22, 2006, Ardebili sent the UCSV an email providing a new email address for their business communications. On December 13, 2006, Ardebili sent the UCSV an email message requesting quotes for additional parts, including one super heterodyne receiver and one

9

channelized receiver.  Ardebili continued to send the UCSV RFQs for additional parts.

On February 6, 2007, the UCSV received an email message from Ardebili stating, in part:

"Our main mission is to supply Iranian needs." Another excerpt from that message read:

You are kindly requested to provide us your shortest delivery time and

your quotation for following items urgently.

```
1-Gyro Compass
P/N: QA2000 & QA3000
MFG: HoneyWell
QTY: 20 SET
2-Gyro compass
P/N: 446350-1
MFG: US DYNAMICS
QTY: 60
3-IR CAMER [sic]
P/N: IRIS TGS
MFG: SAGEM
QTY: 5
"4-Gyro Compass SF2100
MFG: LITON
QTY: 20SET
```
Please let me know if you could supply this parts for Iran. Where country will you ship to Iran?

**MAPCGM0003 Phase Shifters**.   Email communication continued through April 9,

2007,  when the UCSV received an email message from Ardebili saying, "This is urgent inquiry.

You are kindly requewsted [sic] to quote us for following P/N urgently: "P/N MAPCGM0003

903218B Description: Phase Shifter, S-Band, 6 Bit 2.3-4.1 GHz Required quantity: 1500 Mfg:

M/A-COM Inc.  On April 9, 2007, the UCSV received two identical email messages that asked if

UCA#1 and Ardebili could have direct chat through Yahoo messenger.

According to the manufacturer, the MAPCGM0003 phase shifter "provides a key

function in a transmit and receive (T/R) module. T/R modules form the active radiating elements

10

of an electronically steered antenna. The RF functions in a T/R module, typically designed as microwave monolithic integrated circuits (MMICs), are the power amplifier, low noise amplifier, driver amplifier, control logic circuits, and phase shifters. The phase shifter is occasionally integrated into the control logic circuit but more commonly is provided as a stand-alone MMIC. The purpose of the phase shifter is to provide the antenna the ability to point (or steer) the radiated power (beam) in different directions. By adjusting the individual phase of the signal from each T/R module through the associated phase shifter the resultant beam can concentrate its power in a specific direction. Digital phase shifters are normally described by the number of bits involved in their control. The more bits, the more precise the ability to steer the beam. A six bit phase shifter is the state of the art."

Military applications for phase shifters include phased array radar, satellite communications, and electronic warfare. Ardebili did not have the required State Department license to export this article from the United States or the required license from the Department of Treasury, Office of Foreign Asset Control (OFAC) to export goods or technology to Iran.

On April 16, 2007, the UCSV sent an email message to Ardebili. The text portion on the message read in part:

> "For 1500 units of MAPCGM0003, total price will be $95,182.50USD.
> Twelve percent advance payment will be $11,421.90USD. This is for a
> unit price of $63.455 with a 7.5% markup. My price from the
> manufacturer is $59.40.

On April 17, 2007, UCA#1 sent an email message to Ardebili asking if he could assume that the MAPCGM0003 request was also for Iran. On April 17, 2007, the UCSV received an email message from Ardebili stating in part, "Yes this for Iran".

11

On April 19, 2007, the UCSV received an email message from Ardebili. The text portion

of the message read:

> "I know e [sic] are involve on block business [black market] and this is risky
> merchendise [sic] to purchase, but [sic] pls know that I [sic] have
> offeres [sic] from other sources know!!!!  OK?
> "Abour [sic] banking activities, our customer have account in side of
> Iranian bank and your sould [sic] be able to get the L/C from Iranian
> bank and transfer to other nationality banks.  Icould [sic] provide all
> option in Main L/C for you . "About total QTY of MAPCGM003: Please be
>
> note the total need is 10,000, but because of high budegtary [sic] the
>
> customers are willing to purchase in different section. Awaiting to
>
> receive your offer urgent."

On April 25, 2007, the UCSV received an email message from Ardebili which read in

part, "About Tyco parts: Our customer have receive offer from 3 company. One of them is us, As

customers have very bad experience in ourchase [sic] of the parts and lot of companies didi [sic]

not success [sic] to deliver the parts, so they may disided [sic] to ask 3 mentioned company to

deliver the parts.  So the 1400 unit may devide [sic] with 3!!! However you should do your best

to purchase it for us. The QTY will be specify in near future but you should try in 1400 unit

know. Also we will provide 12 % prepayment in this matter for you after receive yourofical [sic]

P/I and customers PO. "I hope that you will be alone company which capable to deliver the goods

to customers. So please send me the official Performa Invoice in Your letterhead urgently."

On April 26, 2007, UCA#1 sent an email message to Ardebili.  Part of that message read,

"I am leave now for long auto trip ....  You should be receive Pro Forma and letterhead today.  I

12

did not list CONSIGNEE in Pro Forma. You can fill that in how you like. Please scan and email

back to me what you have done."

On April 26, 2007, the UCSV received the following email message from Ardebili

concerning the phase shifter transaction:

2-For Ma/Com ,
Please send us the proforma [sic] in word format by e-mail, enable us
to do modification by typing and sending revised P/I to you .
As I [sic] know thee is no alternative .so let us kow [sic] if you
could find any alternative in this matter .

On April 30, 2007, the UCSV faxed a letter on UCSV letterhead to Ardebili. The text of

the letter read:

As per our earlier communication, I hereby offer for your
consideration for purchase one thousand four hundred (1,400) units of
S-Band, 6 Bit 2.3-4.1GHz phase-shifters, Model No. MAPCGM0003 903218 B
manufactured by Tyco Electronics (M/A-COPM). All units will be in new
condition and working order. Price for each unit will be $63.455USD
FOB Iran Air Terminal, City of Baku, Azerbaijan. Total price for
1,400 units will be $88,837.00USD FOB Air Terminal, City of Baku,
Azerbaijan. Payment for each unit shall be made via revolving letter
of credit within fourteen (14) calendar days following delivery of said
unit(s) being turned over to your representative at Iran Air Terminal
in city of Baku, Azerbaijan.

Number of units per shipment will be determined by seller but subject
to concurrence of buyer. Manufacture of said units shall begin within
two (2) weeks following down payment/cash deposit equal to 12% of total
price. The down payment shall be applied to the purchase of the
unit(s) involved in the first shipment. Down payment shall be made in
accordance with details communicated to you in previous correspondence.
The price and terms offered herein are guaranteed for a period of eight
(8) months from the date of this letter. Shipment of all 1,400
units is guaranteed within four (4) months of receipt of deposit.
The price quoted herein represents a total profit margin of 7.5%, and
is offered in good faith for the purpose of establishing positive
relationship with you and your customer.

13

Between April 30, 2007, and May 20, 2007, the electronic dialog continued between the

UCSV and Ardebili. On May 21, 2007, the UCSV contacted Ardebili using Yahoo messenger.

During this conversation UCA#1 and Ardebili discussed payment for the phase shifters.  UCA#1

stated:

As I send you Pro Forma total price of 1400 units is $88,837USD.  The prepayment is
$10,660, which is deduct from total."  Later in the conversation Ardebili says, "I need your cusin
information, tel/fax/office address, bank information.

On May 21, 2007, the UCSV contacted Ardebili using Yahoo messenger.  During this

conversation UCA#1 provided information for an ICE undercover bank account in Wilmington,

Delaware, into which Ardebili would send the payment.

On May 24, 2007, UCA#1 placed a consensually recorded phone call to Ardebili and

spoke to Ardebili, who identified himself as "Ahkami" (an alias for Ardebili). Ardebili related

that attempts had been made without success to establish contact with the UCSV's bank in

[Europe].

On May 29, 2007, the UCSV received an email message from Ardebili stating, in part,

that, "We could not do payment, We just can open The L/C."

On June 1, 2007, the UCSV received an email message from Ardebili.  In that message

Ardebili stated that he knows that he has agreed to pay $10,000 for pre-payment of the phase

shifters, but that he would rather use a letter of credit ("L/C").  On that same day email

communications continued with UCA#1 and Ardebili.  Ardebili sent an email message to the

UCSV.  The text portion of the message read:  "Please send me e-mail to Ardebili.  For test I

want to have new safe e-mail with you." UCA#1  responded with a one line test message that

read, "As per your request."

14

On June 2, 2007, Ardebili contacted the UCSV using Yahoo messenger. Excerpts from

that Yahoo messenger session are as follows,

> AMIR A.: you asked me more about our company
> AMIR A.: do youlike to know more ?
> UCA#1: Yes, can your company make prepayment of 12%?
> AMIR A.: will you accept lower pre-payment to start the business?
> UCA#1: What did you have in mind?
> AMIR A.: US $ 3000 for start , then we will pay the money for e
> when you shipped
> UCA#1: For order of 5000 units, price will be over $317.000    This
> means a prepayment of $3000 is less than one per cent.
> AMIR A.: I know , but we have the po in our hand , what is your problem
> UCA#1: I have no problem.  You have a problem.  You have told your
> customer that you could deliver product after I tell you over
> and over that deal will require pre-payment of 12%. I have
> explain you already today that my cousin does not want to take
> big risk for customer who cannot make payment.

From June 2, 2007, through June 7, 2007 Ardebili and UCA#1 continued email

communications discussing aspects of the potential deal to include prepayment, price, and the

fact that Ardebili had another potential source for the phase shifters.

On June 07, 2007, the UCSV sent an email message to Ardebili.  The text portion of the

message read, in part:

> You have not answer my last email, but if I may assume that your side
> can pay in reasonable time after delivery of product (I hope in 2-3
> weeks at most), my side will be happy to deliver first thousand of
> phase shifters.  This will be with your side making cash payment after
> delivery instead of LC as you proposed yesterday.  As soon as you wire
> the $6.000USD to my cousin account in Delaware USA, my side will begin
> configuration of the chips to meet your customer needs.  I am think
> delivery will be about two months after we receive prepayment.

On June 7, 2007, Ardebili contacted the UCSV using Yahoo messenger.  Excerpts from

that Yahoo messenger session are as follows:

UCA#1: My cousin and I have decided your terms are good enough. That is
providing you will be able to pay in reasonable amount of time after
product is deliverd to customer.
Amir A.: ok, thank you
Amir A.: let me know if you are agree to receive US$ 6000 to start
shipping the 1000 pcs?
UCA#1: Yes. When you send the $ to my cousin's bank in Delaware US, we
will have factory configure phase shifters. I expect about two months
after receipt of money we can deliver.
UCA#1: How long after customer receives the merchandise will you provide
total payment for these units?
Amir A.: Max. 2-4 weeks, , but what about the next 4000 pcs?should we
wait 2 mounth for each 1000 pces as partial ?
UCA#1: Please you must understand. It is very unusual for the
manufacturer to have such big order. I can guarantee the first
delivery will be 2 months after receipt of prepayment. Additional
shipments might be also 2 months - but maybe not. We will have to ask
manufacturer how fast they can make.
Amir A.: I have suggestion as follows
Amir A.: if you could convince them to place the order for 5000 , but
ask them to ship in 1000 pcs package,
Amir A.: I mean that , we could wait 2 mounth for first 1000 pcs
Amir A.: after 2-4 weeks , you will receive full payment for 1000
+another 6000 for next 1000.

UCA#1 went on to say that he must see money in the Delaware account before this deal

becomes real. Ardebili replied that he has "the formal agreement with my customers in Iran"

On June 13, 2007, Ardebili contacted the UCSV using Yahoo messenger. During this

session UCA#1, as part of a longer message, told Ardebili that, "A letter of credit from an Iran

bank is garbage anyway. If your bank refuses to pay, what do we do? Ask the UN to help us?

We are violating the law by selling you these devices. What court is going to help us?"

In that same Yahoo messenger session, UCA#1 and Ardebili discussed the use of the

phase shifters. The following is an excerpt from that session:

UCA#1: You know these parts are used in missiles.
UCA#1: My cousin has tell me that Peoples Republic of China tries often

16

to buy them but canot.
AMIR A.: may be , but our customer do not need to use in isle , they
need it for radar I think
AMIR A.: yes I know, I loosed my time because loss a lot of time to fnd
the parts in china
AMIR A.: finally I found the supplier which quoted me the part for 0.6 $
each
AMIR A.:
UCA#1: Will this deal make you a hero with Ministry of Defense?
AMIR A.: not directly
AMIR A.: we have the purchase order from one of the companies which they
are subsidery of the ministry of defense
AMIR A.: in Iran the minstry of defense will not purchase the needs
directly, the companies wich are in subsidery should supply needs
UCA#1: It is still good.
AMIR A.: do you know , how does you cousin will purchase this part?
UCA#1: What do you mean?  Terms of payment?
UCA#1: You must understand, in the US this deal is very sensitive. We
canot use normal LC, and the way we transfer money in these matters is
discreet.

On June 23, 2007, Ardebili contacted the UCSV using Yahoo messenger and asked

UCA#1 if he had received the payment.  Ardebili claimed that he sent the money "last week".

On June 25, 2007, the UCSV sent an email message to Ardebili stating that there was no money

in the account and asked when the money was sent and through what intermediary bank.  On

June 28, 2007, the UCSV received an email message from Ardebili stating that there was a

problem transferring Euros into a United States account.

Communication continued between UCA#1 and Ardebili from June 28, 2007, through

July 12, 2007.  During these communications Ardebili and UCA#1 discussed other potential

business deals to include night vision devices.  On July 12, 2007, Ardebili contacted UCA#1

stating that he had recently lost money and that he had a meeting with his customer [Iran] about

the "mapcgm0003" phase shifter. Later in the session, Ardebili asked UCA#1 if he would accept

"$3000 as pre payment?" due to his recent financial woes.

On July 13, 2007, UCA#1 sent an email message to Ardebili saying that he would agree

with Ardebili sending $3000 now and sending $3000 later. On July 19, 2007, the UCA#1

received an email message from Ardebili (dated July 18, 2007). The text portion of the message

read:

> My broker contacted me just know [sic]. They need the beneficiary
> full address, contact detail TO DO THE PAYMENT.
> ALSO PLEASE LET ME KNOW tEL/fAX , mOBILE [sic] AND FULL NAME"

On July 19, 2007, the UCSV sent an email message to Ardebili. The text portion of the

message read:

> I feel as though we are going back to playing strange games. Your broker
> needs the name of bank. The name of bank, the address of bank, fax number of
> bank, the name of beneficiary are all on the Pro Forma....
> It is corporate account. If you want address of company, you can use
> [address of SAC/PH UC storefront]. ... I telld [sic] you in previous email that if
> there are problems, CALL THE BANK DIRECT."

On July 19, 2007, the UCSV received an email message from Ardebili. The text portion

of the message read, "The money paid to Dubai. They are trying to pay to your account. I will

back to you with swift of the exchange. do [sic] not be worry. Also let me know your mobil

[sic] number."

On July 25, 2007, the UCSV received an email message from Ardebili. The text portion

of the message read,

> How are you. Finally please find the swift as attached.
> The payment should be in our account. Please check and inform me ASAP.

18

Attached to the message was a digital file containing a copy of a message dated July 23,

2007, which described the payment of $3,000 to the ICE undercover account in Wilmington,

Delaware.

**Digital Air Data Computer (DADC-107).**  In an email from Ardebili to the UCSV dated

August 7, 2007, Ardebili wrote:

> Abut: P/N: DADC-107: Also we need your update about the , P/N: DADC-107 .  As I
> aware this unit is manufacturing in Israel and install in F-4 .  Could you supply?  This is
> too urgent.
> Best Regards
> Amir

The DADC-107 is "a complete Form/Fit/Function (FFF) replacement for the existing

Central Air Data Computer installed on F-4 aircraft."  The DADC-107 is a United States

Munitions List Article under category VIII(h).  Therefore, export of this article requires a United

States State Department license.  Ardebili did not have the requisite State Department license to

export this article from the United States.  Nor did Ardebili have a license from the Department

of Treasury, Office of Foreign Asset Control (OFAC) to export goods or technology to Iran.

On August 17, 2007, the UCSV contacted Ardebili using Yahoo Messenger. Ardebili

responded and engaged in communication concerning a meeting in a Central Asian city.  The

following is an excerpt from that Yahoo messenger session in which Ardebili identified himself

as the same:

AMIR A.: I will send you copy of my pasport
UCA#1: OK and please to make your flight reservation now - my cousin will make reservation to
match when you come.
AMIR A.: when will he receive to [Central Asian city]?
UCA#1: 28SEP would be good.
UCA#1: Can you come that day?
AMIR A.: and when will he leave ?

UCA#1: After our meeting
AMIR A.: did you asked him to come to Dubai ?
UCA#1: Yes and he say no
AMIR A.: because I should be Dubai on this time
AMIR A.: please ask him again
UCA#1: When can you come [Central Asian city]?
AMIR A.: I prefer to meet each other in Dubai
AMIR A.: is it impossible?
UCA#1: Stop this
AMIR A.: I will cancle my meeting in Dubai
AMIR A.: do not be worry
UCA#1: Our future is going to be big. I sometimes believe you do not know how big will our deals be.
AMIR A.: I will send you my pasport copy for invitation letter
UCA#1: Can you send in email, or must you send fax.
....
AMIR A.: do you know my real name ?
UCA#1: Amir AMIR A.?
AMIR A.: no
AMIR A.: Amir Hossein Ardebili
AMIR A.: this is my real name
UCA#1: Very nice to meet you.

**QRS-11 Gyro Chip Sensors**. While Ardebili was negotiating the acquisition of the

phase shifter components and the DADC-107, he also negotiated the acquisition of gyro chips

with an ICE undercover agent (UCA#2) located in Boston, Massachusetts.

On October 26, 2005, Ardebili sent UCA#2 a request for quote (RFQ) via email for ten

(10) QRS11-00300-100 gyro chips. On October 31, 2005, UCA#2 provided Ardebili a pro forma

invoice quoting the sale of ten QRS11-00300-100 gyro chips at $3,000 per unit with a total sale

price of $30,000. In multiple emails between Ardebili and UCA#2, Ardebili advised that the

parts were destined for his customer in Iran, and that due to the current United States embargo

and trade restrictions, Ardebili wanted the gyro chips exported without the required State

Department export.

The BEI GyroChip Model QRS11 Quartz Rate Sensor, Model No. QRS-11-00300-100, is listed on the United States Munitions List in Category XII(d). As such, an export license would be required from the Department of State for export of the gyro chips. Additionally, this item could not be exported to the Islamic Republic of Iran, which is an embargoed country. ICE agents determined that Ardebili did not have any export license for the gyros. The QRS-11s are solid-state gyro chips that can be used in thousands of applications to include numerous advanced aircraft, missile, space and commercial applications.

On November 28, 2005, Ardebili wired $7,000 to a bank account belonging to a United States undercover company from a U.A.E. bank account, as a down-payment for a partial order of QRS-11 gyro chip sensors.

In February 2006, Ardebili directed UCA#2 to mis-describe and send the two (2) gyros to hide the fact that they were export controlled and mail them to his front company in the U.A.E. via express courier. Ardebili said he would arrange for trans-shipment to Iran. ICE agents coordinated with an express courier company to arrange a staged "dummy" shipment to be shipped to one of Ardebili's front companies in the U.A.E. That "shipment" was staged to appear as if the express courier returned the parts to UCA#2 due to missing paperwork. As a result, Ardebili continued to communicate with UCA#2 providing numerous alternate suggestions to ship the gyros.

UCA#2 told Ardebili that he had a tentative meeting in the Fall of 2006 with a Russian customer. UCA#2 explained that the purpose of this meeting was to demo a sonar system, which Ardebili also has an urgent requirement for, to a Russian customer, and that UCA#2 would be

21

willing to meet with Ardebili to discuss future illegal shipments. Ardebili agreed to meet UCA#2 and indicated that he would also bring his customer in order to inspect the sonar system.

In June 2006, Ardebili directed that UCA#2 re-send the gyros to a consignee in Great Britain via express courier, who would allegedly trans-ship them to Ardebili in Iran. UCA#2 attempted to discourage Ardebili of this method, indicating that it was too risky, and urging Ardebili to wait to discuss sending the gyros and other military items during their tentative meeting. Ardebili was anxious to receive the gyros as soon as possible, so that he could sell them to his customer and secure the remaining gyros order and additional requests for such military items as described earlier. As a result, investigating ICE agents again coordinated with the express courier company to arrange a second "dummy" shipment, which appeared to be detained and seized by United States Customs and Border Patrol (CBP) inspectors.

On August 10, 2007, Ardebili contacted UCA#2 to check into the status of the two (2) gyros and indicated that he would be willing to meet UCA#2 for the purpose of accepting the gyros and discuss future business and shipments. In a telephone conversation, Ardebili told UCA#2 that he had tentative plans to travel to Central Asia in October of 2007 and asked if UCA#2 would be willing to meet him there. UCA#2 agreed to do so.

**October 2007 Undercover Meetings**. On October 1, 2007, and October 2, 2007, Ardebili met with ICE undercover agents in a Central Asian nation to consummate the aforementioned transactions. ICE agents showed Ardebili the phase shifters and the gyros during those meetings. ICE undercover agents stated to Ardebili that they had, in fact, smuggled both the phase shifters and the gyros out of the United States for this transaction. Ardebili stated that the payment for the phase shifters originated in Iran. Ardebili also requested that the undercover

agents make arrangements to ship both the phase shifters and the gyros back to Iran for him. Ardebili confirmed that all of his customers are located in Iran and that all of the requests he sends are for Iran Electronics Industries.

During these meetings, Ardebili made a cellular telephone call to an unknown associate in Iran instructing him to wire transfer approximately $60,000 to the undercover bank account. This was an additional payment for the phase shifters. Ardebili also discussed acquiring an additional 4000 phase shifters due to the fact that he believed that 5000 parts were required for each radar system that employed them. Ardebili further stated that there is no direct way to transfer money to the United States from Iran and that an exchange bank in Iran is used to transfer funds to a cooperating foreign bank for final transfer to the United States. Ardebili stated that he thought the foreign bank utilized in the initial payment for the phase shifters was in Germany.

Ardebili also provided undercover agents with the Iran Electronics Industries shipping account number that could be utilized to ship commodities on Iran Air airline back to Iran. Ardebili stated that there was a contract between Iran Electronics Industries and Iran Air and that this would be a good service to use in order to send the phase shifter parts.

During the first meeting on October 2, 2007, UCA#1 asked Ardebili if he was working together with other people to acquire military technology. Ardebili responded yes.

In the meetings, Ardebili also discussed the acquisition of a DADC-107, with a 10% down payment before shipment, the remainder to be paid in the weeks following receipt. Ardebili also stated that Iran is the only country that has the F-4 aircraft and that none of them work.

23

During the October 2, 2007 undercover meeting, Ardebili took delivery of the gyros, signing a receipt.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **FILED UNDER SEAL** |
| **v.** | ) | |
| | ) | |
| **AMIR HOSSEIN ARDEBILI,** | ) | **Criminal Action No. 07-155-GMS** |
| **a/k/a AMIR AHKAMI,** | ) | **Criminal Action No. 08-73-GMS** |
| **a/k/a ALEX DAVE** | ) | |

## CERTIFICATE OF SERVICE

I, Sherry Kaminski, an employee with the United States Attorney's Office, hereby certify that

on the 1st day of December 2009, I served the forgoing:

### Government's Sentencing Memorandum

by causing two copies of said document to be served on counsel of record by First Class Mail as

follows:

> Edmund D. Lyons, Jr., Esq.
> The Lyons Law Firm
> 1526 Gilpin Avenue
> Wilmington, DE 19806

Sherry Kaminski

25