```
1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                               - - -

   UNITED STATES OF AMERICA,
4                                        :      CRIMINAL ACTION
           Plaintiff,                    :
5                                        :
             v.                          :
6                                        :
   AMIR HOSSEIN ARDEBILI,                :
7  a/k/a AMIR AHKAMI,                    :
   a/k/a ALEX DAVE,                      ;
8                                        :      NOS. 07-155 (GMS)
           Defendant.                    :      and   08-73 (GMS)
9
                               - - -
10
                         Wilmington, Delaware
11            Monday, December 4, 2009 at 11:04 a.m.
                      SENTENCING HEARING
12
                               - - -
13
   BEFORE:        HONORABLE GREGORY M. SLEET, Chief Judge
14
                               - - -
15 APPEARANCES:

16

17          UNITED STATES ATTORNEY'S OFFICE
            BY:  DAVID L. HALL, ESQ.
18          Assistant United States Attorney

19               Counsel for Plaintiff

20

21          THE LYONS LAW FIRM
            BY:  EDMUND D. LYONS, JR., ESQ.
22
                 Counsel for Defendant
23

24
   M. Naim Saidi                    Brian P. Gaffigan
25 Interpretor                      Registered Merit Reporter
```

```
 1                          - oOo -

 2                  P R O C E E D I N G S

 3             (REPORTER'S NOTE:  The following sentencing

 4    hearing was held at 11:04 a.m.)

 5             THE COURT:  Good morning.  Please be seated.

 6             MR. LYONS:  Good morning, Your Honor.

 7             MR. HALL:  Good morning, Your Honor.

 8             THE COURT:  Good morning, Mr. Hall.

 9             MR. HALL:  David Hall for the Government.  We're

10    here in the matter of the United States v Amir Hossein

11    Ardebili, 07-155-GMS and 08-73-GMS.  This is the time the

12    Court has set for the sentencing of Mr. Ardebili; and the

13    Government is prepared to proceed.

14             THE COURT:  Thank you, Mr. Hall.

15             Mr. Lyons, are you prepared to proceed?

16             MR. LYONS:  I am.

17             THE COURT:  Mr. Ardebili, you can sit while you

18    address the Court or stand.  Whichever you would --

19             MR. LYONS:  I know that he would like to speak

20    with Your Honor.

21             THE COURT:  Let's swear our interpreter.

22             MR. LYONS:  Yes, Your Honor.

23             (M. NAIM SAIDI, affirms to interpret at 11:05 a.m.)

24             THE COURT:  All right.  Mr. Lyons.

25             MR. LYONS:  Yes, Your Honor.
```

1          THE COURT:  Good morning.

2          MR. LYONS:  You know, this is one of these cases

3   that they didn't tell you about in law school, and it's been

4   a challenge.

5          THE COURT:  Or maybe judge's school, Mr. Lyons.

6          MR. LYONS:  I represent Mr. Ardebili.

7   Mr. Ardebili is the gentlemen seated to my left, obviously.

8   And I will tell Your Honor that I've had a great deal of

9   contact with Mr. Ardebili since he has been brought to

10  this country.  I have truly come to see him as a unique

11  individual; and I do not hesitate to say that I view him as

12  a friend of mine.  I hope there comes a day when I'm able

13  to welcome him into my home for a meal and to share our

14  friendship.

15          He is a man who, in many ways, is caught between

16  two nations.  And one of the things that bothered me about

17  this case from the beginning was that, Your Honor is aware

18  that when he did what he did, which is undisputed, he was a

19  citizen of Iran, in Iran, working indirectly for the Iranian

20  Government and carrying out the wishes of the Iranian

21  Government.

22          Now, in fact, he had never left Iran.  He's I

23  guess now 35 years old, but he has a bachelor's degree in

24  Electrical Engineering, but he had never left Iran.  He

25  lived in a town by the name of Shiraz, a great city of Iran.

1    It is a number of hours south of Tehran.  But that was the

2    town he was born in, that was the town he grew up in, that

3    was the town he was educated at.

4              He lived in the home of his mother and father.

5    I believe that his brother also lived in the home.  Also

6    living in the home was his wife.

7              I know that there has been press in this matter

8    that talked about him as an arms dealer.  And I think the

9    parties are in agreement that that really is a misnomer.  He

10   was a procurement agent for the Government of Iran, but the

11   problem that I have with the terms "arms dealer" is that it

12   conjures up notions of someone sitting on a yacht in the

13   Mediterranean, shipping military items to the highest bidder

14   around the world no matter whom without absolutely any

15   regard for the consequences, and the key being that they go

16   to the highest bidder.

17             He was, in my view, perhaps not so elegantly,

18   just a little guy.  He was a little cog in the wheel.

19   There are at least, I have learned in the course of my

20   communications with the Government in this matter, probably

21   several hundred or more such individuals in Iran who do not

22   work directly for the Government but they act as procurement

23   agents.  They receive information of materials the

24   Government of Iran would like to purchase, and people like

25   Mr. Ardebili go out on the web from their office in Iran,

1    meaning their own individual office in Iran.  His office was

2    either one or two rooms with several computers and several

3    telephone lines, and that was about it.  I think he had one

4    partner and one employee, a secretary.  And they go out on

5    the Internet trying to buy certain described items that

6    they've been told to try to purchase.  They are not buying

7    guns and bullets.  On the other hand, we recognize that he

8    was attempting to purchase items that can be used, and are

9    used, militarily.

10           One of the items that I recall forms the basis

11   for the charges here were a computer to be used in operating

12   the F-4 fighter jet.  Now, I don't want to get into an

13   argument about international relations, but I will note that

14   these F4s are items that we sold to Iran 30 some years ago,

15   before the fall of the Shah.  If our countries ever resumed

16   relations, then it is possible that we might resume selling

17   items again.

18           Now, it's against the law now.  He did it, and

19   he knew it.  But he is not someone who sat afar like Manuel

20   Noriega, shippings drugs into this country, that everyone

21   within or without this country would agree was wrong.  It

22   was what it was.

23           There was a mention in one of the conversations

24   he had with the undercover agents when he actually traveled

25   to that Central Asian country, which has been widely

1    reported to be Georgia, that the Iranian Government was

2    preparing for war.  They think war is coming.  But at close

3    reading and a close listen to the undercover tape -- and I

4    think the Government agrees with us -- that he, in the

5    course of mentioning that, he talked about it as a defensive

6    war.  That people in Iran were concerned that their country

7    would be invaded by the United States.  Now, to be sure we

8    have an interest in not arming people in offensive or

9    defensive wars, but it's a little bit different than if it

10   were an offensive war.

11           But to address this issue of who he was and how

12   big a part of the picture he is, and how far up the food

13   chain he was, it is instructive to note that on one of the

14   undercover transactions, which probably involved about

15   $90,000 I think as a total price, the agents asked him to

16   come up with $10,000 -- $10,000 or $12,000 as a down payment

17   on the purchases.  And at first he agreed to that; and then

18   he hemmed and hawed; and he said, Well, would you take

19   $6,000?  And then he still didn't deliver the funds.  They

20   were to be wired into a bank here in the United States, in

21   this District as it turns out.  And he came back to them and

22   said, Well, would you take $3,000?  And they said yes.

23           And the reason that he was hemming and hawing

24   was, as I understand the facts in the case, he was dealing

25   with his own money at the time.  Although he was buying for

1    the Government of Iran, the Government expected him to at

2    least bear the initial cost, and he didn't have the money.

3    So he eventually came up with the $3,000.  In Boston, he did

4    deliver either $6,000 or $7,000.

5              But my point is that if we were buying nuclear

6    secrets, and Iran was directly involved in what was going

7    on, you would think if you named your price, the money would

8    be flying over here any minute.  He was -- he is so far down

9    the chain that he had to fund it himself.

10             I'll tell Your Honor that this was his first

11   trip ever outside the country of Iran.  I mean here is a

12   young man, 33-34 years old, living at home, married for

13   18 months, living with his wife in his parents home.  This

14   was a big deal for him to be able to travel to Georgia, to

15   meet with the undercover agents.  And he viewed it as

16   almost, it was going to be like going on holiday, so much

17   so that he took his father with him.  That first there was

18   conversation about taking his wife with him.  For whatever

19   reason, she didn't travel, but he took his father with him.

20   And, in fact, the father who was 70 years old, and who

21   everyone agrees had nothing to do with these events, he took

22   him to the meeting with the undercover agents.

23             Now, that at the very least shows a simple lack

24   of sophistication, a definite lack of sophistication that

25   is consistent with the picture that I tried to paint of

1    Mr. Ardebili as a young man who was trying to make a living.

2              I don't recall it's in the presentence report, I

3    do note that the presentence officer said that he probably

4    did about a million dollars a year gross in business.   I

5    spoke with Mr. Hall.   I think we're in agreement that that

6    comes at least in part from what Mr. Ardebili said to the

7    undercover agents.   But what is interesting is that -- and

8    this I don't recall if it's in the presentence report, but I

9    don't think we have much disagreement about this.   He made

10   $30,000 to $40,000 a year, the equivalent, from his work.

11   And none of it was guaranteed.

12             And what is in the presentence report I recall

13   is that he would send out thousands of requests to purchase

14   parts, and most of them go nowhere.   I mean literally over

15   90 percent go nowhere.   Unfortunately, there are people in

16   this country who are Americans who are willing to break the

17   law.   And some of them -- and, of course, the undercovers

18   held themselves out as similarly situated.   And so those

19   are the closed transactions, the concluded transactions that

20   you see, but for the most part, all of his efforts end up in

21   failure.

22             He has come to this country remembering that it

23   was his first trip out of Iran.   He is now been in this

24   country for two years -- over two years now.   And -- well,

25   two years right -- actually, two years next month.   He has

1    been in custody over two years, a little bit more than two

2    years.  And as we advised Your Honor, he has been held in

3    pretrial confinement in the special housing unit of the

4    Federal Detection Center in Philadelphia.  We understood

5    that that was necessary because of a concern regarding the

6    unusual circumstances of this case.  One of the problems

7    that you have in prison is that if you come in with the name

8    Amir Ardebili, and people know that you are from Iran, the

9    first thing that non-discriminating people will figure out

10   is -- or think is that you must be a terrorist.  So, in

11   part, that was part of the reason for separating him out.

12           So I'm not being critical of the Government, but

13   we can't escape the fact that for whatever the reason why he

14   was held in that situation, he was locked down, and remains

15   locked down, 23 hours a day.  He has limited access to

16   bathing facilities.  He has very limited access to other

17   prisoners.  He was in some sense ostracized at least in the

18   beginning and perhaps still is because the other prisoners

19   think that he is a terrorist or something like that.

20           His conditions of confinement have been such

21   that when you're deprived -- and he'll address this with

22   you -- but when you are deprived of social interaction and

23   the ability to look up and see the sky other than on a

24   limited basis and you have weeks of just spending time by

25   yourself, with limited interruption, not surprisingly, you

1    get depressed.

2             Now, I suppose a cynic could say he is depressed

3    because he faces these serious charges.  And that's true,

4    that is possible.  But I will tell Your Honor that when you

5    are in a situation like that, he would often say to me,

6    and his phrase was "my brain is boiling."  It's a pretty

7    colorful phrase, but it really would emphasize his -- his

8    emotions would swing wildly when I dealt with him.  His

9    judgment would swing wildly when I dealt with him.  And it

10   all is part and parcel of the conditions under which he was

11   housed, through no one's fault.

12            He has had health problems.  Well, he has been

13   treated for depression.  He is on medication for depression

14   now.  He has had health problems while in prison.  I told

15   Your Honor that he has lost a number of teeth due to

16   pre-existing dental problems.

17            I'm not upset with the Department or the Bureau

18   of Prisons, although I did get, actually got his medical

19   records last week, and they confirm everything I'm saying.

20   I have them here with me, if anybody wants to look at them,

21   including the medication for depression.  But the only

22   services they can offer are emergency services.

23            So he had a choice.  He could either have the

24   remaining teeth, not all of his remaining teeth but the

25   remaining teeth that were a problem pulled or he could tough

1    it out.  Well, he chose to tough it out.  Unfortunately, he

2    has lost five or six teeth in the process.  And that is just

3    really unfortunate.  So he has been punished tremendously to

4    get to this point here.

5            He has been separated from his family.  It is

6    true that the Government has facilitated some contact with

7    his family in Iran.  He has spoken with his mother on

8    occasion.  Usually, those conversations -- and there aren't.

9    -- there are probably not more than 10 over two years, but I

10   wasn't keeping track of that.  But I don't criticize the

11   Government for that.  I understand this is different than

12   calling it over to New Jersey.  But those calls usually end

13   up in tears on both ends of the phone call.  And it is

14   unclear to me that he can ever return to Iran.

15           I guess the thing I would say is that, last

16   week, the Iranian foreign minister, who is the equivalent

17   of our Secretary of State, as I understand it, publicly

18   questioned Mr. Ardebili's mental condition, and not as in,

19   "gee, we feel bad for him because maybe he is upset that he

20   is depressed because he is over there," but the implication

21   that I got from reading the article in the Tehran Times

22   was that if anyone chose to talk with him, meaning the

23   U.S. Government, chose to talk with Mr. Ardebili, he has

24   pre-existing mental problems; which I don't believe to be

25   the case, by the way.

1          But it's not clear to me that if he were

2     returned -- if he went back to Iran, after the service of

3     whatever sentence Your Honor imposes, it's not clear to me

4     that he could do so safely.  I'm very concerned that his

5     family remains in Iran.  His mother, father, his brother,

6     his wife's family all remain in Iran.  They have not been

7     harmed at present.  There is just a lot about this case

8     where we don't know where it's going.

9          And so he has suffered tremendously to get to

10    this point.  I know that I have taken a pretty aggressive

11    position in terms of what I would recommend, and many times

12    I won't recommend an actual sentence, but I have recommended

13    time served.  And I think I can do that with a straight face

14    given everything of record in this matter.  And, in addition,

15    these very difficult conditions under which he's been held.

16    But, most importantly, because he is not the guy that,

17    perhaps, at least the public at large thinks he is when they

18    read, Arms Dealer, you know, Enters Guilty Plea or Arms

19    Dealer to Be Sentenced.  He is just not that person.  That

20    is the movies.  That is not this young man here.  And so I

21    think that we can ask, with a straight face, that you give

22    serious consideration to that.

23          I don't know what the future holds for him, even

24    if Your Honor were to impose time served.  I don't know what

25    his status is in this country as far as whether or not he

1    could remain, whether or not he might leave.  I just don't

2    know.  And that, in and of itself, that must prey on your mind.

3              So I ask Your Honor to consider that as well as

4    anything he has to say.  I've considered what he has to say,

5    and he asked me if I should take things out.  And I said no.

6    In this country, you get to say what you need to say, and

7    that's the beauty of this system.

8              And I think what he says will be appropriate.  And

9    I ask that Your Honor listen carefully to what he has to say.

10             THE COURT:  I will.  Thank you, Mr. Lyons.

11             MR. LYONS:  Thank you, Your Honor.

12             THE COURT:  Mr. Ardebili.

13             MR. LYONS:  I will tell Your Honor that our

14   interpreter is here.  He understands he is here only to

15   assist if there is a problem.  We're comfortable with that.

16   Mr. Ardebili will address the court in English, haltingly

17   at times; but he is an educated man, and his English,

18   unfortunately for him, has improved over the last two years.

19             THE COURT:  Good morning.

20             THE DEFENDANT:  Thank you.

21             Your Honor, I am pleased to have a chance to

22   speak with Your Honor face-to-face.

23             (Pause.)

24             MR. LYONS:  Do you want me to read it for you?

25   Are you sure?  I will read it for you.

```
 1                    THE DEFENDANT:  (Nodding yes.)

 2                    MR. LYONS:  Have a tissue.  Stay right here.

 3                    I'm going to read it for him.  We have a

 4     prepared statement.  It's not the difficulty in language,

 5     it's the emotion.

 6                    THE COURT:  If he needs a break, we can take a

 7     break.

 8                    MR. LYONS:  Would you prefer to take a break?

 9                    THE DEFENDANT:  (Nodding yes.)

10                    MR. LYONS:  Yes, please.

11                    THE COURT:  We'll take a short recess.

12                    (Brief recess taken.)

13                    THE COURT:  Okay.  Please be seated.

14                    THE DEFENDANT:  Thank you, Your Honor.

15                    THE COURT:  No problem, Mr. Ardebili.

16                    THE DEFENDANT:  Your Honor, I am pleased to

17     have a chance to speak with Your Honor face-to-face after

18     two years and three months of confinement and solitary

19     imprisonment.

20                    I hope I could give Your Honor some information

21     which could change my horrible situation.  I don't want to

22     minimize the wrong thing which I done.  I accept

23     responsibility.  And I plead guilty to all charges U.S.

24     Government gave me since I brought to United States.

25                    In the very first time when my attorney
```

1    Mr. Edmond Daniel Lyons explained my real situation and

2    showed me being guilty of all charge could be the only

3    chance to go through all of this trouble.  I trusted and

4    plead guilty.  But when I hear last week about the news,

5    which the U.S. government has introduced me as an

6    international arms dealer, I shocked, stunned, and got

7    senseless, up to now.

8         Before I brought to U.S., my laptop confiscated,

9    and U.S. agent analysis all information in four months

10   between my arrest and extradition.  My laptop contains all

11   of my business information, plus my character, family

12   pictures, so on.  There is enough information on my laptop

13   to understand a lot about me.  There is nothing to indicate

14   or suggest I am inclined to violence, religious extremes or

15   any political activities or being international arms dealer.

16   I just was a businessman, but not for ammunition and gun.

17        Undercover agent sent a picture of weapons and

18   machine guns in several times when I was in Iran.  I didn't

19   know this e-mail coming from the agents.  They demanded me

20   to buy because they say the price of these parts are very

21   low.  I needed the money, but none of this time I even ask

22   for quote, or ask for more information or detail.  My answer

23   was one word, "no."  This is not my business.

24        U.S. Government knew I was a businessman, which

25   was buy electronic components, chips, resistors, diodes,

1    capacitors.

2            Having military standard of the part is not

3    indication of using the part in a military parts.  Military

4    standards means more accuracy, more life, and working for

5    longer time in a hard condition.  Medicals, oil and gas and

6    other industries use these parts as well as military

7    industries.

8            In other aspect, in meeting on Georgia Republic,

9    just before they arrest me, the undercover agents suggested

10   several times to bring me to their warehouse to show me the

11   weapons which they have ready to ship.

12           This was my response:  I would never participate

13   in any business which people may lose their life because of

14   their parts.  Unfortunately, U.S. Government just put a

15   short part of the meeting, which was about eight hours, but

16   for right and justice decision, Your Honor should see all of

17   them.  I even had no chance to see what part of this meeting

18   brought to public to able to speak or explain about.

19           Since I brought to USA, U.S. Government gave me

20   new name in jail, with no permission of sending mail, phone

21   call, or even I didn't know how I could contact Your Honor.

22   (My letters to Court which I wrote last year should show the

23   horrible situation which I was on and I am on it now.)

24           MR. LYONS:  May I interrupt for just a second?

25   May I ask him a question, Your Honor?

```
1                    THE COURT:  Yes.

2                    MR. LYONS:  Mr. Ardebili, it is true that you

3       did have the ability to write letters to the Court?

4                    THE DEFENDANT:  Yes.

5                    MR. LYONS:  And you did do that?

6                    THE DEFENDANT:  Yes, sir.

7                    MR. LYONS:  And you had the opportunity to write

8       letters to me as well?

9                    THE DEFENDANT:  Yes, sir.

10                    MR. LYONS:  And it is also true -- and you tell

11      me if it's not, just tell me -- that it is accurate that the

12      Government did assist you on some occasions in speaking with

13      your family in Iran as well as your wife?

14                    THE DEFENDANT:  Yes, sir.

15                    MR. LYONS:  All right.  So it's not like you

16      never had the opportunity to --

17                    THE DEFENDANT:  Yes.  I just pointed to the

18      restriction which I had in jail.

19                    MR. LYONS:  Okay.  But we did work around them?

20                    THE DEFENDANT:  Yes.

21                    MR. LYONS:  Okay.

22                    THE DEFENDANT:  The answer which I receive from

23      prison staff regarding all restriction was same statement.

24      This is for your protection.

25                    This matter two years and three months.  I don't
```

1    need more protection, which case U.S. Government put the

2    clips in Internet.

3              I wrote Your Honor on 7/29/08, letter to Court,

4    after I found Your Honor name as my judge.  I don't need

5    protection from U.S. Government.  In fact, I have nothing

6    to hide.  Your Honor, I wanted to know how I could be

7    international arms dealer when I was in business trip for

8    first time of my life with my father with $3,000?  What

9    international arms dealer act like this?

10             Which international arms dealer refuse to buy

11   any parts related to gun or ammunition?  Which international

12   arms dealer act likes this?  How I could be international

13   arms dealer when there is no evidence or any interest for

14   weapons and ammunition in my laptop, interviews, and e-mails?

15             Which international arms dealer give his own

16   house address in Iran as a shipping address for the parts?

17   Which international arms dealer act like this?

18             Which international arms dealer, after 33 years

19   old, after one year marriage, still live with his parents?

20             Which arms dealer looking for business in home

21   appliances, medical, oil and gas industries?

22             Your Honor, U.S. government showed a part of my

23   meeting with the undercover agent before I arrested.  The

24   key point is, "This is a very short clips from eight-hour

25   meeting."  For right judgment, you should see whole picture.

1    Your Honor could find I'm a person hate war, because I'm

2    coming from a country which had a lot of sacrifice in

3    eight-year war and defense against enemy.

4              MR. LYONS:  Are you talking about the war with

5    Iraq?

6              THE DEFENDANT:  Yes.  That was -- that's why I

7    and my people hate war, but the people in U.S. and other

8    countries think opposite.

9              MR. LYONS:  Wait a minute.  They think opposite,

10   meaning that you like war?

11             THE DEFENDANT:  We are terrorists.  Yes.

12             MR. LYONS:  Okay.

13             THE DEFENDANT:  I can explain.

14             MR. LYONS:  All right.

15             THE DEFENDANT:  Looking to history show Iran

16   never disrespect any other country integrity but, here, when

17   inmate or met prison staff know my nationality, the first

18   question is that, "Do you have terrorist charge?"  Your

19   Honor, you know I have nothing to do with the terrorists.

20   When they see my condition in the Federal Detention Center

21   in a solitary confinement for two years, the first

22   contention is that.

23             In the very first time after I arrested in

24   Georgia Republic, after I entered my cell, after while when

25   I told my name "Amir Hussein," they called me "Saddam

1    Hussein."  With this view, I should not shocked when U.S.

2    Government introduced me as an international arms dealer.

3                Recently, other dealer from Belgium arrested

4    with the payment of more than $100,000 for the twin engine

5    of the F-5 aircraft.  Your Honor, he charged for one count

6    of conspiracy maximum for five years.

7                I have the article of newspaper about detainee

8    in Gitmo receiving five and-a-half years for a

9    terror-related charge.  The U.S. Government said he had

10   weapon/missile in his car when confronted by the U.S. and

11   Afghan military.  Yet he only receive five and-a-half years.

12   Again, my situation is not comparable in no form or fashion,

13   yet then I'm facing to 12 or 14 years for attemption to buy

14   chips?

15               Last year, I hear in the media in USA that U.S.

16   military in Afghanistan is supplying the Afghan military

17   with banned weapons and ammunition from China via Albania

18   Government in violation of the U.S. military sanction laws

19   against China due to the massacre in China in Tiananmen

20   Square in 1989.

21               Or how about the tourist ban plus violation

22   committed by some Florida tourist agencies that send

23   tourists to Cuban in the relation of the U.S. law?  All they

24   receive for a first violation is a fine.

25               Or how about the U.S. gas giant companies via

1    KBR bypassing U.S. sanction laws shipping products, spare

2    part to Iran via companies in gulf state?  Also, these

3    American oil companies does this to avoid certain tax laws.

4    No action being taken against this violation of U.S.

5    sanction law against Iran.  This is the billions of dollars.

6            However, I'm being persecuted and possibly

7    sentenced to 14 years.  What about western chemical

8    manufacturer which sold chemical to Saddam Hussein which

9    cause thousands death and injure, which after about two

10   decades ending the war in Iran, you can find a lot of

11   injured people in the hospital, even could not wake up or

12   speak, wishing to die everyday.

13           No court in world prosecuted the seller of that

14   chemicals, but I'm being persecuted for attempting to buy

15   chips and possible sentence for 14 years.

16           Again, I repeat, I don't want minimize my

17   responsibility, but the fact is I am Iranian citizen.  I

18   didn't broke any law in Iran regarding my country law.  I

19   was working in company which supplies spare parts for Iran

20   industries.  Most of the infrastructure of the Iran

21   industries are coming from the USA which purchased before

22   Iran Revolution.

23           MR. LYONS:  Do you agree, though, for example,

24   that the DAB computers were to be used in the F-4 fighters?

25           THE DEFENDANT:  Yes, sir.

1          MR. LYONS:  All right.  Did you, at one point,

2     talk with the undercover agents about the Iranians believe

3     war is coming?

4          THE DEFENDANT:  Yes, sir.

5          MR. LYONS:  What did you mean when you said

6     that?

7          THE DEFENDANT:  There are a lot of, because it

8     was eight hours meeting and they asking about everything.

9     It was a time that they talking about a war in Iran and

10    Afghanistan.  Then I told my personal -- my personal belief

11    that Iranians think that when the USA targeted the Iraq and

12    Afghanistan, they think that the next target may be Iran.

13         MR. LYONS:  I understand.  All right.

14         THE DEFENDANT:  This infrastructure need spare

15    parts.  Iran government don't act directly.  They buy their

16    needs from other companies like my company.  Your Honor, in

17    fact, this is the people that suffer more when the

18    governments are dispute.

19         I hold in a SHU, a Special Housing Unit or

20    "hole" for two years, Eighth Floor in Federal Detention

21    Center in Philadelphia.  Just last Friday, the prison staff

22    change my given name to my real name.  At least I could get

23    my name after two years and three months.

24         No. 1.  The condition of the confinement in the

25    SHU unit amount to 23 hours a day lockdown status with one

1    hour of recreation three to four days a week.  In a "cage,"

2    and ability to move freely in a unit on general population

3    floors doesn't exist at all in SHU.

4              No. 2.  All privilege and access to number of

5    services are limited to those in SHU due to security reasons

6    and also due to the manner in which one is being held and

7    housed.  Even seeing a doctor, one is handcuffed and

8    face-to-face interaction with the staff limited and done

9    primarily through a door or a small window in a metal door.

10             No. 3.  Everything attempted in a Special

11   Housing Unit represent a significant hardship on inmates due

12   to the nature of who he is confined and his 24-hour-a-day

13   lockdown status.

14             No. 4.  Window in cellblock limited the amount

15   of the nature sunlight and sensory exposure have been

16   eliminated and inmate is in virtual sensory isolation tonic

17   without the normal sensory input.  This long-term

18   deprivation causes one psychological and emotional trauma

19   and effects health.

20             No. 5.  My medical records show how SHU effected

21   my health.  In addition to all mentioned items, I am in a

22   prison out of my country with harsher restriction and having

23   no friend or know the culture.  The slang talk in the jail

24   made the situation very harder for me.  I cannot understand

25   what they say after two years.

1           It's incredible the situation which I was faced

2    for two years and three months in jail.  SHU is a jail

3    inside the jail to punish bad inmates.  SHU designed to

4    break down inmate.

5           I, myself saw several times how criminal inmate

6    with long experience in being in a jail was crying just

7    after a week for staff, to go back to downstairs in general

8    population.

9           Regarding my special case and limited contact

10   with family, I could not hear my father voice in these two

11   years yet.

12          My family suffering in Iran as well as me.  My

13   wife left her university in Iran, came over here to help me,

14   but she suffer very hard being in a country which unknowing,

15   unknown to her, live by herself in here.

16          Your Honor, today, in this hallowed place, your

17   decision not only could change, my situation could change.

18          MR. LYONS:  My family --

19          THE DEFENDANT:  My family situation or even

20   could change two nation relationship which had no diplomatic

21   relationship for three past decades.  Usually, big and

22   significant change come after a small spark.  Your decision

23   could be the spark to kindle.  Turn on your light and

24   wisdom, may bring the real good change for two great nations

25   or even the world, because, Your Honor, as a part of the USA

1    Government, making a decision for me as one people of Iran.

2              Thank you.  Sorry, and looking for your mercy.

3              THE COURT:  Thank you, Mr. Ardebili.

4              MR. LYONS:  I will tell Your Honor, before we sit

5    down, that Mr. Ardebili wrote this without my assistance.

6              Is that right?

7              THE DEFENDANT:  Yes, sir.

8              MR. LYONS:  And --

9              THE DEFENDANT:  It take one week.

10             MR. LYONS:  He doesn't have much else to do

11   there.  Thank you, Your Honor.

12             THE COURT:  Thank you.

13             Mr. Hall.

14             MR. HALL:  Thank you, Your Honor.

15             There actually is some agreement between the

16   parties as to the nature of the offense and the underlying

17   facts in the offense.  Mr. Ardebili has characterized

18   himself as a businessman, and that is correct.  That is

19   what he was.

20             He has objected to the use of the term

21   "international arms dealer."  In the sentencing memo, we're

22   calling him an Iranian procurement agent.  It's a specific

23   description of what he is doing.  But I don't want to

24   minimize the nature of what it is that he was doing.  His

25   offense is very serious, and this is why we do not join in

1    the defense's request for time served.

2             The nature of his business was international.

3    It is true he is not sitting on a yacht in the Mediterranean.

4    We certainly agree with that.  But he was in the business

5    of acquiring components, mostly from the United States, for

6    the Government of Iran that involved the shipment of those

7    items, the export of those items illegally without a license

8    from the United States.

9             The nature of his business is sophisticated.  It

10   required export and transshipment, most often through Dubai

11   and the United Arab Emirates, that required a front company

12   in that location through which the items would be transshipped.

13   The payment for those items required international money

14   laundering through a system of brokers to get the money out

15   of Iran into the United States.  So I do not agree with the

16   characterization that he is an unsophisticated businessman.

17   He is involved in a sophisticated business that involves

18   international shipments and money laundering.

19            He is involved in arms.  The nature of the arms,

20   as Mr. Ardebili says, are not -- we're not talking about

21   firearms.  We're not talking about bullets, as his lawyer

22   said.  But we are talking about armaments.  We are talking

23   about munitions list items.  These are items that are used

24   in weapons systems and are used in war.

25            THE COURT:  Is it accurate to say that the parts

1   he purchased also have commercial application as well?  Is

2   that a fair characterization?

3           MR. HALL:  Yes, sir.  If you look at the sum

4   total of everything Mr. Ardebili did, there are some items

5   that could be used in either commercial or military

6   applications.  I don't doubt that there are some items he

7   procured for Iran which were used for commercial applications,

8   civil applications.  Of course, that is also illegal because

9   of Iran's embargo.

10          There are probably many situations in which

11  Mr. Ardebili did not know what the use for the items was.  I

12  mean a diode is a diode.  And I think this is part of the

13  point he and his lawyer are trying to make, is that when you

14  are buying diodes and transistors, you might not know

15  exactly what they're being used for, and they're generic

16  electronics components.  So we agree with that to that

17  extent.  However, many of the components he is purchasing

18  are used for military use, and he knows that.  And he said

19  so during the undercover investigation.

20          And in terms of the items at issue here, he

21  specifically identified the use for the items.  That the

22  phase shifter could be used in phase array radar for

23  antimissile systems.  And, specifically, as to the DADC-107,

24  that that was used to upgrade the F-4 so, in his words, the

25  F-4 could be launched.

1            Mr. Lyons has stated, as to Mr. Ardebili's

2     comments about war coming, that that is a defensive war.

3     And that is a fair comment in terms of what it is

4     Mr. Ardebili said as he said it with the purpose of the --

5     for example, the antimissile system was used to defend

6     against a war.  But that doesn't mean that the application

7     is not an application that is a threat to the national

8     security of the United States.  I'm not sure it matters to

9     an American pilot whether the system coming at him was

10    procured for defensive or offensive purposes.  In fact,

11    I'd go so far as to say it does not matter to him.

12            This is the nature of Mr. Ardebili's business.

13    This is not a situation where he exported or caused the

14    export of something one time.  He was in the business of a

15    sustained practice of going to work everyday in order to

16    procure items from the United States illegally, and he

17    procured many items from the United States illegally.

18            I do agree with what both Mr. Ardebili and his

19    lawyer have said in terms of the nature of Mr. Ardebili's

20    state of mind.  He is not a crazed ideologue.  He is not a

21    terrorist.  He is not trying to destroy the United States

22    in terms of his specific intentions, and he is not trying to

23    destroy Western Civilization.  But he is a businessman, a

24    sophisticated businessman who is trying to make money.  He

25    knows he is making his money illegally.  He knows he is

1  making his money by obtaining U.S. goods and technology for

2  the Government of Iran.

3           When he was asked why he was buying these items,

4  he said specifically it was for war.  That was the context

5  in which he made that remark.  He is a businessman who is

6  procuring items that are specifically a threat to the United

7  States in the hands of Iran, and that is what makes this

8  offense so serious.

9           He might not be a blood-and-guts type defendant.

10 He is about invoices and spreadsheets.  But what he is doing

11 is very serious.  He might not be the one with the gun in

12 his hand, but he's the one who put the gun in somebody

13 else's hand.  And for that reason, we'd ask you to take into

14 consideration, in fashioning an appropriate sentence, the

15 very serious nature of this offense and the threat to

16 national security.

17           THE COURT:  Let me ask you, is that -- the last

18 statement you just made.  I'm thinking about the application

19 of these parts when you say he is the one or one of the ones

20 who put the gun literally in someone else's hands.  What are

21 we talking about, to the extent that you are able to

22 articulate here?

23           MR. HALL:  Well, in terms of -- first of all, he

24 is one of.  He is not the only person doing this.  Mr. Lyons

25 made that point, and that is correct.

1              THE COURT:  I understand.

2              MR. HALL:  He is part of an acquisitions

3    apparatus that is obtaining parts that are necessary in

4    order to use military systems in Iran.  Mr. Lyons stated

5    that the F-4 was originally acquired by Iran from the United

6    States before the Revolution during the regime of the Shah.

7    And those F-4 aircraft are still in the Iranian inventory.

8    As Mr. Lyons notes, they are old.  And to be effective in

9    war, they need to be upgraded.  To upgrade -- the DADC-107

10   is specifically designed for the purpose of upgrading an F-4

11   to make it, to increase its performance so that it's a

12   viable fighter aircraft.

13              The phase shifters are specifically used -- they

14   can be used in a large number of military applications, but

15   they're used to acquire targets and can be used to acquire

16   multiple targets simultaneously.  They do, as Mr. Ardebili

17   said during the undercover investigation, they do have an

18   antimissile application.  They can be used in that application,

19   specifically designed against missiles, incoming missiles,

20   but they can be -- phased array radar can be used to acquire

21   any sort of airborne target, including aircraft.  And the

22   gyros, of course, can be used in a large number of

23   applications, including missile guidance, aviation, and so

24   on.  A gyro has a wide range of applications.

25              THE COURT:  Thank you, Mr. Hall.

```
 1              MR. HALL:  Thank you.

 2              THE COURT:  Is there anything else, Mr. Lyons?

 3              MR. LYONS:  Excuse me one second.

 4              (Pause.)

 5              MR. LYONS:  May my client address Your Honor?

 6              THE COURT:  Sure.

 7              THE DEFENDANT:  Your Honor, I said to Your Honor

 8     that I don't want to minimize my fault which I did, but, in

 9     fact, if I wasn't an Iranian citizen which grow in Iran,

10     have affairs in Iran, and see the situation in Iran, and

11     have the business.  The nature of the business is -- you

12     cannot ignore the nature of the business.  I wanted to feed

13     my family, but I never attempted to buy something to harm

14     any person.  In fact, when our customers send us the

15     inquiry, they never said we need this for weapon.  They

16     never say what the application.

17              MR. LYONS:  Your customer would be someone with

18     the Government of Iran?

19              THE DEFENDANT:  Yes.  And if you refer to our

20     customer record, they are not manufacturing the gun or such,

21     such items.  They are preparing.  They have the website and

22     they have something same as the communication and the

23     articles like this.  That is why we was working with them.

24              When I receive some picture from the machine gun

25     from the agents, and I say no, it's not my business.  If
```

 1    even for the need of the money, even I wanted to do that, I

 2    have no channel to sell such parts because I even have no

 3    customer in this.  Our customers, they are in the defense

 4    sector but have no mission to build such products.

 5              Regarding the meeting in the Georgia Republic,

 6    every businessman wanted to show himself as a big man

 7    because it was the demand that if I want to do another

 8    business, I should -- I should not be a Yellow Cab dryer.  I

 9    should be a real businessman.

10              If you look to our website, everything,

11    everything is fake.  The picture, everything is because we

12    know that nobody would come to see us.  So we wanted to show

13    ourself a big company, a big person which could deal with

14    these people, because we have that -- we meet with the very

15    good partners.  So when we are talking in these meetings,

16    it's a part of -- it's a part of the business to do

17    exaggerations.

18              THE COURT:  Sure.

19              THE DEFENDANT:  A lot of exaggeration happen in

20    such meetings.  It's the nature of the business.

21              Thank you, Your Honor.

22              THE COURT:  Let me ask you, were you aware that

23    some of the purchases in which you were involved with would

24    have potential military application as well as commercial

25    application?

1            THE DEFENDANT:  Yes, sir.

2            THE COURT:  And you I think have admitted that

3    regardless of whether the application was commercially

4    military, the trading in this matter violated U.S. law?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  All right.  Thank you.  In fact, why

7    don't you just stay right there.

8            Is there anything else, Mr. Hall?

9            MR. HALL:  No, Your Honor.

10           THE COURT:  Having pled guilty to Counts 1

11   through 9 in Criminal Action 07-155, and Counts 1 through 5

12   in Criminal Action 08-73, Mr. Amir Ardebili was found guilty

13   of violating Title 50 of the U.S. Code, Sections 1702 and

14   1705(b)(1); Title 18 of the U.S. Code, Section 1956(a)(2)(A);

15   Title 18, Section 554; Title 22, Section 2778; and Title 18,

16   Section 371.

17           Mr. Ardebili, in a short time I'm going to

18   impose sentence, but allow me to explain the reasons for

19   that sentence, the sentence I will impose.

20           Now, Mr. Ardebili, the Supreme Court of the

21   United States has issued any number of decisions,

22   particularly in the last five years or so, that give courts

23   and judges like me guidance and directives in how to

24   approach the notion of an appropriate sentence, how to make

25   that determination.  These decisions and others direct that

1    I consider a variety of factors when I exercise my judgment

2    and discretion in the determination of an appropriate sentence

3    for a particular individual such as yourself.  I'm specifically

4    directed by these decisions as well as federal statute to

5    impose a sentence that is sufficient but not greater than

6    necessary to achieve a number of sentencing goals.

7             Among them, to justly punish the individual

8    transgression of that individual who stands convicted before

9    the Court; to deter others who would engage in the conduct

10   that is at issue; clearly to deter you specifically from

11   engaging in any of that type of conduct in the future; to

12   protect the citizens of the United States, to protect the

13   public; to provide the means in the most effective manner

14   available to this Court to assist in your rehabilitation; to

15   promote respect for the laws of the United States of America.

16            So in attempting to achieve these and further

17   goals, I'm further directed to consider a number of factors.

18            Among them, the nature and circumstances of the

19   offense, the severity.  Everyone here has acknowledged that

20   we're dealing with a serious offense.  You acknowledged this

21   from I believe the outset.

22            Your history and characteristics.  Your

23   background.  Who you are.  Who is Amir Ardebili, as best

24   as I might be able to understand that, with the limited

25   information available to me.

1              The sentencing guidelines are a factor.

2              The kinds of sentences available to me.

3              Those things are, and have been, on my mind,

4    Mr. Ardebili, in thinking about an appropriate sentence, and

5    particularly as I've listened to your lawyer, to Mr. Hall,

6    to you, and having considered the positions of the parties

7    before coming out here.

8              So as to your personal history and background,

9    according to the presentence report, you're 35 years of age,

10   born in Shirez, Iran to Zahra -- and forgive me for

11   mispronouncing the names -- Ahkami --

12             THE DEFENDANT:  Yes.

13             THE COURT:  -- and Nasrolah --

14             THE DEFENDANT:  Yes.

15             THE COURT:  -- Ardebili.  Your parents continue

16   to reside in Iran, as well as does the rest of your family,

17   including your sister, Afshinn, I believe.

18             MR. LYONS:  Brother, Your Honor.

19             THE DEFENDANT:  That's my brother.

20             THE COURT:  My apologies.  Your brother,

21   Afshinn.

22             You were raised in a loving home environment

23   under what I think it's fair to say has been described as

24   middle class conditions.  Your parents lived in essence to

25   provide for you, as do so many of us who have children, even

1  selling their jewelry to help with your tuition for your

2  degree in engineering.

3           Your father was employed with the Shirez

4  Division of Revenue.  Your mother was a history teacher, and

5  taught Arabic and Farsi.  Your parents are now retired, and

6  you continue to maintain a relationship with them.  And

7  we've heard about the opportunities, albeit limited, that

8  you have had to maintain at least to some degree phone

9  communication back home.

10           You are married, have no children.  I think you

11  were married for 18 months, approximately, when you were

12  arrested on this offense.  Your wife remains somewhere in

13  the United States, as I understand it.

14           THE DEFENDANT:  Yes, sir.

15           THE COURT:  You attended school in Iran,

16  attended the University of Shirez where you received your, I

17  believe it's called a Masters of Science in Electronics.

18           THE DEFENDANT:  Yes, sir.

19           THE COURT:  You're an electrical engineer.

20           THE DEFENDANT:  Yes, sir.

21           THE COURT:  After receiving that degree, you

22  were employed by an entity known as the Iran Electronics

23  Industry (IEI) --

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  -- a government-owned entity for

1    about five years; is that correct?

2             THE DEFENDANT:  Yes, sir.

3             THE COURT:  You left IEI because you could make

4    more money on your own as a contractor.  You were

5    self-employed at the time of your arrest.

6             Another factor I must consider, Mr. Ardebili, is

7    the nature and circumstances of your offense.  We talked a

8    good bit about this.  I know this is the first offense, as

9    best I know, that you have committed of any kind.  It is,

10   however, indeed a serious one.  You acted as a procurement

11   agent for the Government of Iran.  As such, you were

12   involved in the acquisition of components, a wide array of

13   components, including military aircraft parts, Kevlar, night

14   vision devices and communications equipment, as I understand

15   it.

16            More specifically, you negotiated the purchase

17   and illegal export of something called a QRS-11 Gyro Chip

18   Sensor or Sensors, which are solid-state gyro chips that can

19   be used in many, many applications, including, among them,

20   those applications, advanced aircraft, missile, space, and

21   commercial applications.

22            Something also called an MAPCGM003 Phase Shift

23   or Shifters, as part of your inventory.  Again, many

24   applications for these parts, including phased array radar.

25   Mr. Hall has spoken about phased array radar which are used

1    by the military in the configuration of instruments that

2    facilitate the acquisition of targets in missile guidance,

3    as I understand it.

4            Something called Digital Air Data Computer or

5    Computers, fully computerized form/fit/function, as it's

6    described, replacement for the Central Air Data Computer

7    which was previously on the F-4 aircraft that I gather in

8    part at least would, if installed, would enable this

9    aircraft to function.

10           Both the Gyro Chip Sensors and the Digital Data

11    Computer, as you know, require a license from the Department

12    of State for export.  You knew, and again admitted as much.

13    You admitted previously on many occasions that it was

14    illegal to make these purchases, and you were aware of the

15    banking restrictions as well which precluded the transfer of

16    money from Iran into the U.S. as a result of that embargo.

17           You present somewhat of paradox to this Court,

18    however, Mr. Ardebili.  On the one hand, it seems that you

19    were motivated by profit.  Some would call it greed, I'll

20    call it profit.  And the money you made from an illegal

21    enterprise, at least in part an illegal enterprise, it seems

22    you were working within the borders of your nation toward,

23    at least in your view, its, as you understood it, its

24    government's interest.

25           Regardless, it would seem, however, that your

1    offenses could pose, if they haven't already, a direct

2    threat to the security of the United States.  In essence,

3    you procured whatever the Iranian government required to

4    maintain and upgrade its military capability so it could, in

5    your view, defend itself against the United States.  In

6    fact, in your words -- I believe this is an accurate

7    quote -- the Iranian Government thinks war is coming, or

8    words to that effect.

9             It's also noteworthy, however, that -- and,

10   again, we have established I think that there is no dispute

11   -- that the parts in issue have both commercial and military

12   application.  Well, I think that is undisputed.  Is that

13   correct?

14             MR. HALL:  I don't think we have a dispute.  The

15   DADC-107 actually is specifically for a fighter aircraft.

16             THE COURT:  Okay.

17             MR. HALL:  Components could be used in either,

18   but they are licensable as arms components on the munitions

19   list.

20             THE COURT:  Do you agree?

21             MR. LYONS:  I don't disagree, Your Honor.

22             THE COURT:  That's another way of saying we agree.

23             MR. LYONS:  I agree.

24             THE COURT:  All right.  It's sort of a lawyer

25   way of saying I agree.

1          MR. LYONS:  That's true.  I am a lawyer.

2          THE COURT:  Okay.  You are.  Very good.

3          Nonetheless, I find that you have shown remorse

4    for your actions both prior to coming here today, and I

5    think genuine remorse.  How does one ever know, but my view

6    is, Mr. Ardebili, the tears were not fake.  And the emotion

7    that I have seen here today could generate from many

8    sources, but I think one of them, perhaps, and I'm rather

9    persuaded, is your regret about what you did.  And I don't

10   think it's regret for just getting caught.

11         Additionally, additional information has been

12   brought to my attention that will inform in part my view of

13   an appropriate sentence, Mr. Ardebili.  Again, this is your

14   first criminal offense of any type and being labeled a

15   convicted felon carries with it a high price.  In addition,

16   this has been discussed today, not by me, but it would

17   seem that you are effectively a man without a country.  The

18   lawyers indicated that you will not likely be able to return

19   to Iran, which it seems to be reasonable for me to conclude

20   that it is likely that you will be separated from your

21   family for an indefinite period of time.

22         Mr. Ardebili, I have also considered the

23   argument that you made in your motion for downward variance,

24   and that has to do, and you have gone on at some length

25   about that today, about the conditions in the Special

1       Housing Unit, the SHU, in Philadelphia.  I think it's beyond

2       dispute that those conditions are difficult, but I think

3       it's fair for me to say that condition you find yourself or

4       found yourself in is due in large part to your own actions.

5       And it's not to say that you should be tortured; and I'm

6       not suggesting that you have been.  The BOP would not be

7       happy to hear me say that.  And I don't mean in any way to

8       intimate that the conditions have been inhumane in any way.

9       Were that the case, I am sure your lawyer would have

10      addressed that situation aggressively.  But it would also

11      seem, at least based on what has been said today, that the

12      condition resulted from certain necessities.  So I'm going

13      to reject that as a basis for varying downward.  That is,

14      the conditions of your confinement today.

15              And, finally, I must consider the type of

16      sentences available to me, Mr. Ardebili.  In doing so, I

17      must be cognizant of the message I send, especially since

18      your offenses, as I already noted, have the potential, if

19      not already have directly threatened the security of the

20      United States, its domestic citizens, and potentially its

21      citizens and allies fighting abroad.  Those who may be

22      tempted to commit the same or similar types of offense to

23      the ones in question here today have to know that there are

24      going to be consequences for actions of this type.

25              So I believe that the sentence I'm about to

1    impose, Mr. Ardebili, is sufficient to comport with the

2    objectives that are outlined in Title 18 of the U.S. Code,

3    Section 3553(a).  It is my hope that this sentence will

4    provoke in you a greater respect for this nation's authority

5    and its laws.  In my opinion, the sentence that I am about

6    to impose will appropriately reflect the seriousness of the

7    offense you have committed or offenses that you have committed,

8    to serve to punish you justly, and hopefully to deter you

9    and others from this type of conduct in the future.

10          So it is with these thoughts in mind, and

11   pursuant to the Sentencing reform Act of 1984, that I

12   exercise my judgment and discretion and hereby commit you,

13   Amir Ardebili, to the custody of the Bureau of Prisons, to

14   be imprisoned for a term of 60 months.

15          This is -- well, let me be more technical.  On

16   each of Counts 1 through 6 of the 07-155 Action and Counts 2

17   through 5 of the 08-73 Action, and concurrent terms of

18   60 months for each of Counts 7 through 9 of 07-155 and Count

19   1 of 08-37.  This sentence reflects a downward departure

20   from the advisory guideline range pursuant to Section 5K1.1.

21          Now, upon your release from incarceration,

22   Mr. Ardebili, I'm going to place you on something called

23   supervised release for a period of three years for each

24   count of conviction.  And these are concurrent terms of

25   supervised release.

1          Now, it's not exactly clear to me how this is

2    going to happen, but I must tell you that within 72 hours of

3    your release from the custody of the Bureau of Prisons, you

4    are to report in person to the Probation Office in the

5    District to which you are released.

6          While on supervised release, you shall not

7    commit another federal, state or local crime, and you shall

8    comply with the standard conditions that have been adopted

9    by this Court, and the following additional conditions:

10         You are not to illegally possess a controlled

11   substance.

12         You shall not possess a firearm, ammunition, or

13   destructive device of any kind.  And,

14         You shall cooperate in the collection of DNA as

15   directed by your probation officer.

16         There is an additional special condition; and

17   that is you shall disclose any requested financial

18   information to your supervising probation officer.

19         Now, in accordance with the Memorandum of Plea

20   Agreement, as to the 07-155, Mr. Ardebili is to forfeit

21   $2,980 to the U.S. Government.

22         Again, in accordance with the plea agreement, on

23   the 08-73 case, he shall forfeit $7,000 to the United

24   States.

25         I find, Mr. Ardebili, you do not have the

1    ability and wherewithal to pay the fine.  Thus, I will waive

2    a fine in this case.

3             I must order that you pay the mandatory

4    assessment totalling $1,400.  You can defray that obligation

5    or meet that obligation by entering the Inmate Financial

6    Responsibility Program at the institution to which you are

7    ultimately designated.

8             Mr. Ardebili, I'm going to suspend the mandatory

9    requirement concerning the need for you to be subjected or

10   to submit to drug testing.  There is no indication of any

11   drug use on your part or any need for this Court to monitor

12   that.

13            Counsel, do you know of any other reasons other

14   than those already stated why sentence should not be imposed

15   as announced?

16            MR. LYONS:  I do not, Your Honor.  I assume that

17   the 60 months is with credit time for the time spent.

18            THE COURT:  Absolutely.  Absolutely.  And as you

19   know, Mr. Lyons, it will be.  That is similar.

20            MR. LYONS:  Yes, thank you.

21            THE COURT:  It is entirely up to the Bureau of

22   Prisons as to how they do the counting.

23            MR. LYONS:  I understand, Your Honor.

24            THE COURT:  Okay.

25            MR. HALL:  No, Your Honor.

1                  THE COURT:  Okay.  It is the Order of this Court

2       that sentence be imposed as stated.

3                  Mr. Ardebili, you have right to appeal within

4       ten days.  You need to discuss that with your counsel,

5       Mr. Lyons.  If you cannot afford the cost of that appeal,

6       you indeed only file for permission to file that appeal

7       without paying those costs.  That permission will be

8       granted.

9                  The Clerk's Office here shall prepare the

10      judgment.  My Chief Deputy Clerk shall enter the Judgment of

11      Conviction.

12                 Are there other matters that we need to attend

13      to?

14                 MR. LYONS:  There are none, Your Honor.

15                 MR. HALL:  No, Your Honor.

16                 THE COURT:  Good luck to you, Mr. Ardebili.

17                 MR. LYONS:  Thank you, Your Honor.

18                 (Sentencing hearing ends at 12:22 p.m.)

19

20

21

22

23

24

25